## BAILEY & GRAHAM v. PHILLIPS et al.

(Circuit Court, S. D. Georgia, S. W. January 15, 1907. On Motion for New Trial, December 3, 1907.)

1. CONTRACTS—ILLEGALITY—PUBLIC POLICY.
   Under the Georgia law, contracts to corrupt legislation or the judiciary, contracts in general restraint of trade, contracts to evade or oppose the revenue laws of another country, wagering contracts, and contracts of maintenance or champerty are contrary to public policy and unenforceable.

2. GAMING—GAMING CONTRACTS.
   Gaming contracts, and all evidences of debt, incumbrances, or liens on property executed on a gaming consideration, are void in the hands of any person.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Gaming, § 39.]

3. SAME—BROKER'S SERVICES—LOSSES.
   A broker, who is privy to a wagering contract for the purchase or sale of futures, cannot recover either for his services or losses.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Gaming, §§ 73–75.]

4. SAME—VALIDITY OF CONTRACT—"GAMBLING CONTRACT."
   An agreement for the sale of any commodity for future delivery is void as a "gambling contract," where neither party intends an actual delivery of the property purchased or sold; but if one of the parties in good faith contemplated an actual delivery, and not a mere settlement by a payment of differences in the rise and fall of the market price, the contract was valid and enforceable."
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Gaming, §§ 22–27.
   For other definitions, see Words and Phrases, vol. 4, pp. 3028–3029.]

5. BROKERS—EMPLOYMENT—IMPLIED CONTRACT.
   The employment of a broker to buy or sell a commodity for future delivery implies, not only an undertaking to indemnify the broker in respect to the execution of his agency, but also a promise on the principal's part to repay or reimburse the broker for such losses or expenditures as may become necessary or result from the performance of the agency.

6. GAMING—DEALING IN FUTURES—BURDEN OF PROOF.
   Where, in an action for broker's commissions and losses in the purchase and sale of cotton for future delivery, defendant pleaded that the contract was a gaming agreement, the burden of proof that neither party intended an actual delivery, but a mere settlement of differences in the market price, was on defendants.

Olin J. Wimberly, for plaintiffs.
Merrill P. Callaway and T. J. Hendricks, for defendants.

SPEER, District Judge (charging jury). The issues offered in this case for your determination are on two actions brought by Bailey & Graham, members of the New York Cotton Exchange, one against P. D. and the other against T. E. Phillips. The claim in each case is the

sum of certain amounts alleged to have been paid by the said plaintiffs on account of the particular defendant sued. In the case of T. E. Phillips, it is claimed that he is indebted to the plaintiffs in the sum of $2,950.32, besides interest from June 17, 1904, at 6 per cent. per annum. This sum is alleged to be due upon an open account for commissions, for services, and for money paid and advanced by the plaintiffs for and at the request of T. E. Phillips in selling for his account, and as his agents, cotton for future delivery, according to the rules and regulations of the New York Cotton Exchange, in the city of New York. A copy of the account is annexed, and the petition proceeds to set out in detail the nature of the demand. The other action is brought by the same plaintiffs against P. D. Phillips, and the amount claimed is the sum of $8,625.54, for work and labor done, services rendered, and money paid out and expended by the plaintiffs at the instance of the said P. D. Phillips, with interest at 6 per cent. from the date above mentioned. This is on similar account to that already stated.

There is no question made by the defense as to the accuracy of the account sued for, nor is there any doubt as to the right of the plaintiffs to recover a verdict for the full amount with interest on each action, unless the defense pleaded and set up by the defendants shall be held, in view of the evidence, to be supported by the law, and therefore meritorious. This issue you must determine from the evidence, which has all been submitted to you (none of it as I recall having been excluded), in view, also, of the instructions of law which it shall be my duty to give for your assistance. In other words, since the plaintiffs have produced their account, and given testimony to the effect that it is correct, they are entitled to a verdict therefor, unless, in view of the facts, the plea and defense is sufficient to defeat it. The plea is, in a word, that these claims originated in a transaction for the sale of cotton futures, which is contrary to law and to the public policy of the state of Georgia. Under the law of this state there are certain contracts upon which no recovery can be had. These are contracts which are against the policy of the law. They are such as tend to corrupt legislation, or the judiciary, contracts in general restraint of trade, contracts to evade or oppose the revenue laws of another country, wagering contracts, and contracts of maintenance or champerty.

It is not necessary that I should explain to you all of these contracts which are against the policy of the law. It will be sufficient, for the purposes of your duty, for me to point out that gaming contracts are void, and all evidences of debt, or incumbrances or liens on property, executed upon a gaming consideration, are void in the hands of an person. For instance, under the law of Georgia, a note for illegitimate cotton futures is a gambling contract, and void in the hands of a bona fide purchaser even. A broker who is privy to a wagering contract cannot recover for his services or his losses. Losses in buying or selling futures for his principal, when they are in fact wagering contracts, cannot be recovered. These questions have many times been before the Supreme Court of the state, and there is no doubt as a matter of law that a gambling contract cannot be enforced, and that losses, or services rendered by one who is a party thereto and understands its

character, likewise cannot be recovered. The law simply refuses its assistance to the enforcement of such a contract, for the reason that it is contrary to the general welfare—that is to say, to the public policy —and the courts leave the parties where they find them.

It is, however, true that it is not every agreement for the future sale of commodities that is a gambling contract. The law upon this subject may be expressed as follows: An agreement for the sale of stocks, grain, cotton, or any other commodity is a gambling contract, where the parties do not intend an actual delivery, but agree that at the time fixed for delivery they shall settle by one of them paying the other the difference between the price agreed upon and the market price at the time of delivery. This is a mere bet or speculation on the rise and fall of the price of the article, and is illegal, not only under the statutes, but in most states even independently of any statute. It is illegal by the express statute of this state, and is now so clearly inimical to the public policy of the state that brokerage establishments, known as "bucket shops," are expressly denounced by the statute law.

The policy which forbids contracts of this character is easily discoverable. The commonest form of this disguised gambling in modern life is the contract for the purchase or sale of property in the future, without the intention upon the part of either party to deliver or receive such property; the mutual intention being to settle the contract at the period of maturity thereof, by paying or receiving the difference between the market price and the contract price of the property bargained for. The temptation to those who do not own the property in which they thus deal to engage in such ventures, by which they imagine that large profits may be won at a minimum expenditure, is deemed by the lawmaking bodies to be of such character as to demand statutory protection for the people. This is probably ascribable in large part to the fact that the small and inexperienced dealers in villages and rural communities are wholly incompetent to trade on equal terms in such illegal ventures with the alert and trained intelligences who gather in the great marts of commerce in our country and who devote their powers to this illegal trading. In addition to this, the excitement of such ventures tends to divert the mind of the farmer or small tradesman from those productive enterprises for which he is really capable, and not infrequently to afford a more irresistible and dangerous temptation to those persons who are intrusted with funds for other purpose, which are diverted, at whatever hazard to the true owner, for the possibility by their use of personal gain to the trustee. It is probably true that no practice prevalent in the trade conditions of the present time does more to unsettle legitimate business, to degrade the probity of individuals engaged therein, and to bring unanticipated loss upon what otherwise would be stable and prosperous lines of trade.

It is, however, by no means true that all speculation is gambling. Merchants and manufacturers speculate with entire propriety upon the future prices of those commodities which they sell and buy, or which they manufacture. In other words, they weigh the probabilities of the coming market, and act upon their judgment of future prices in their business transactions. In this way the mind of the merchant or manufacturer becomes second to no other in its vigor and clearness, in pow-

er, in the knowledge of national and international affairs, and of the productive capacity of their own and foreign nations. Nothing can be more admirable than this display of talent and forecast. Such foresight on the part of New York, Boston, or London merchants may control international controversies, and change even the maps of nations. Said Sir Walter Raleigh: "Whosoever controls the commerce of the world controls the world itself." When, therefore, such merchants and others thus act upon their conclusions, and buy and sell in a bona fide way, there is no room whatever for a denunciation of such contracts.

It is true, also, that these exigencies of modern commerce and manufacture may justify the purchase in good faith of cotton or other similar commodities for future delivery, which purchase, although to be carried out in futuro, may depend for its price on the rise or fall of the markets, and in a proper sense may be speculative. For instance, a cotton manufacturer in this city may contract to deliver a large order of cotton sheetings at a certain date in the future and for a certain price. In order to protect his contract, he may, by going into the open market, purchase contracts for cotton to be delivered at a time which will enable him, if his judgment is right, to hedge against any possible loss on his contract to manufacture. He may do this, we will say, in the New York market, and under the rules of the New York Cotton Exchange, and yet he may not anticipate that in any event the cotton will actually be delivered to him in the city of New York. The freight rates from New York to Valdosta would make this an impossible delivery in all likelihood. As he needs the cotton for the daily work of his machines, he may buy it at the most favorable localities of the neighborhood, and, as it is manufactured, he may close out to that extent his New York contracts. He, however, can get his cotton in New York, if by any exigency his business demands that he should have it delivered there. This I do not esteem to be a gambling contract. He may need the cotton for a specific purpose. He, in that event, must have it. If he cannot get it here, he can get it in New York, although he will most probably get its value there, and so there is no injury to either factory or community. This illustration, however, and others which might be given of a legitimate purchase of commodities for future delivery, is essentially different from that which the law denounces, and which is entered into by men who have no possible necessity for the commodity for any productive purpose, or for any purpose at all, who do not expect to take or deliver it, and who only take the chances of the rise and fall of the market, with a view of winning by any adjustment of differences between the price at which they agree to purchase and the actual market price on that date.

Nor is it true that the law, in an investigation of a transaction of this general character, will hold the parties down to the letter of their contracts, whether they are in telegrams, memoranda, slips, rules of a Cotton Exchange, or what not. If, however, it appears from the documentary evidence that the transaction was to be in accordance with the rules of the Cotton Exchange, it will be presumed that both parties understood this, unless the contrary is made to appear by the proof. If it were a question merely between the parties, the general rule that the written contract controls would be enforced; but in a case of this gener-

al character the public has the gravest interest, and, however formally the contract may in letter seem to comply with the law, yet if in fact and in purpose it is in disregard of the law, the court and jury may look through the form, and hear evidence to ascertain what was the real purpose and the real transaction. When, from the proof, it appears that such contracts are gambling contracts in contemplation of law, their injury to the public welfare is not lessened, or the illegal nature of the transaction altered, if it also clearly appears that the agents or representatives of the parties, who carry on such business, entered the rural or village localities and by contract, statement, suggestion, or solicitation induced persons engaged in other vocations to take part in an unlawful purchase or sale of such future contracts.

It is true that when, on the face of the papers or otherwise, it appears in proof that an indebtedness has been created in favor of the plaintiff against the defendant by the future sale or purchase of commodities, the burden of proof is upon the defendant to show that the transaction is illegal and a gambling contract—that is to say, the proof must preponderate in favor of the defendant on that issue—before they can be justified in finding in his favor. The real test whether the ostensible contract is or is not a gambling contract is a question of fact, and it is therefore, where the evidence is in conflict, a question for the jury to determine under proper instructions from the court. It is true, also, that before the jury will be justified in deciding that the contract is a gambling contract, and therefore void, they must find that both parties understood it to be a contract of that character. If one party intended to have a bona fide delivery of the cotton, and the other did not intend such delivery, but intended to settle differences between the market and the contract price, why the contract itself could be enforced at the option of the party who in good faith intended to exact delivery as the case might be. If, however, it was the intention of both parties, evidenced either in conversation, letters, telegrams, or by the oral proof, to settle their contract of future sale by the payment of the differences between the market price and the contract price, and such intention existed at the inception of the contract, this would be sufficient to show that the contract was a gambling one, that it is void, and that the court and jury will help neither of the parties.

Generally it is true that "the employment of a broker to sell [or buy] property for a [lawful] future delivery implies, not only an undertaking to indemnify the broker in respect to the execution of his agency, but also implies a promise on the part of the principal to repay or reimburse him for such losses or expenditures as may become necessary or result from the performance of the agency." This is applicable to this case, provided, however, that the transaction which the broker makes is believed by him to be legitimate, and not a gambling contract, and provided he also believes that the party with whom he contracts for the future delivery of cotton or other property to his principal really and bona fide intended at the inception of the contract to actually deliver such cotton or other property to the broker's principal.

In conclusion, you should carefully consider the oral and the documentary evidence submitted to you in this case, and determine whether

in point of fact the parties on both sides of this transaction at its inception understood that it was to be a dealing in futures, by which the customers of this New York firm should win or lose on the fluctuations of the market, and that the differences should be settled by a payment of the differences between the contract price and the market price on the date when the contract should be executed. If the parties on both sides understood this to be the nature of the contract, I instruct you positively that there can be no recovery. If, however, the plaintiffs, or the defendants, understood that this was a purchase of cotton for future delivery, bona fide in its character, and that the cotton actually was to be delivered, then the plaintiffs are entitled to recover the full amount sued for, although the defendants may have understood that no cotton was to be delivered. On this issue, as before stated, the burden of proof is on the defendants; that is to say, the proof must preponderate in their favor to the extent of producing moral and reasonable conviction on your minds that their defense is true in point of fact.

### On Motion for New Trial.

SPEER, District Judge (orally). Bailey & Graham were members of the New York Cotton Exchange. One of them had a winter home at Thomasville, not far from where the defendants reside. The defendants were the Messrs. Phillips, who appeared to be men of considerable means, and conducted a large business, much of which consisted in purchasing grain, provisions, and cotton for future delivery. They had certain transactions with Bailey & Graham, and the result was a balance in favor of the members of the Cotton Exchange, amounting to about $8,000. They refused to pay this, and suit was brought for its recovery. The issues were submitted to a jury in the Circuit Court of the Southwestern Division at Valdosta, and after the trial, of some four days, in which the parties on both sides were ably and thoroughly represented, and all the facts submitted to the jury, they returned a verdict for the plaintiffs.

A motion is now presented to the court for a new trial. No complaint is made of the decisions of the court or its action at any time. It is now for the first time intimated by one of counsel that, if he had not slept over his rights, he might have made a complaint at a certain time; but he did not make such a complaint. The law will not hear him now to correct the mistake, if it was a mistake, which he made then. I think he was wise not to make the complaint then, because the ruling of the court, the facts being in much dispute, not to direct a verdict for the defendants, was nothing more than a ruling to submit it to the jury, and they were in that situation the proper triers of the facts. I will not attempt to discuss the case at length, but, since it is conceded that the questions at issue were fairly and legally submitted to the jury, I will content myself with reading brief extracts from my charge, as follows:

"In conclusion, you should carefully consider the oral and documentary evidence submitted to you in this case, and determine whether in point of fact the parties on both sides of this transaction at its inception understood that it was to be a dealing in futures, by which the customers of this New York firm should win or lose on the fluctuations of the market, and that the dif-

ferences should be settled by a payment of the difference between the contract price and the market price on the date when the contract should be executed. If the parties on both sides understood this to be the nature of the contract, I instruct you positively that there could be no recovery. If, however, the plaintiffs or the defendants understood that this was a purchase of cotton for future delivery, bona fide in its character, and that the cotton actually was to be delivered, then the plaintiffs are entitled to recover the full amount sued for, although the defendants may have understood that no cotton was to be delivered. On this issue, as before stated, the burden of proof is on the defendants; that is to say, the proof must preponderate in their favor to the extent of producing a moral and reasonable conviction in your minds that their defense is true in point of fact."

Now on that issue, thus fairly presented, the jury found for the plaintiffs the full amount claimed. I think it was a just verdict. There is an enormous business carried on throughout the world by dealing in the future delivery of products of many sorts. The courts have regulated it, and the laws have regulated it, by making it essential to the validity of a contract that actual delivery should be contemplated. That was made plain to the jury. It was a clear-sighted, straightforward, honest jury of the vicinage, many of them among the shrewdest merchants in Valdosta, and there are not many shrewder merchants anywhere else. I see no reason, therefore, to disturb this verdict, and the motion for a new trial is overruled.