### KENT v. DE COPPET et al.

(Supreme Court, Appellate Division, First Department. March 15, 1912.)

1. BROKERS (§ 99*)—RIGHTS OF UNDISCLOSED PRINCIPAL—CONTRACTS FOR SALE OF STOCK.

A broker, who dealt on the Stock Exchange, on instructions from the owner of stock sold it to another broker dealing on the Exchange and sent to the owner a memorandum of sale for his account and risk, which named the purchaser and made the certificate deliverable the following day, and shortly thereafter and on the same day the broker making the sale notified the Exchange of his insolvency, and the purchaser at once closed his contracts with the insolvent, setting off the stock purchased against a sale of the same number of shares to the insolvent, who was the only party he had known in the transaction, and paid the difference on the transaction to the receiver in insolvency and, on the owner's presentation of the sale memorandum and the certificate for delivery, refused to accept it. Held, that the insolvency of the broker making the sale was equivalent to a request to the purchaser to close his contracts, which he was entitled to do without ascertaining the real party in interest, and hence the owner could not recover the price from the purchaser.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 140, 141; Dec. Dig. § 99.*]

2. PRINCIPAL AND AGENT (§ 143*)—UNDISCLOSED PRINCIPAL—CLAIMS AGAINST AGENT.

The rights of an undisclosed principal are subject to claims acquired in good faith against the agent; but the rule does not apply where the person dealing with the agent knew or was chargeable with knowledge of the existence of an undisclosed principal.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 502–512; Dec. Dig. § 143.*]

Miller, J., dissenting.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from Special Term, New York County.

Action by Lottie Kent against Edward J. De Coppet and others. From a judgment for plaintiff, defendants appeal. Reversed, and new trial ordered.

Argued before INGRAH'AM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and MILLER, JJ.

Walter F. Taylor, for appellants.
Henry Escher, Jr., for respondent.

McLAUGHLIN, J.　The defendants are stockbrokers doing business upon the New York Stock Exchange, and this action is brought for the purpose of enforcing a contract for the sale to them of certain stock made upon the Exchange in the usual way by other brokers who were acting for the plaintiff's assignor.

The appeal presents only a question of law; there being no contest between the parties as to the facts. On January 19, 1910, one James W. Escher, plaintiff's assignor, was the owner of 25 shares of the common stock of the Columbus & Hocking Coal & Iron Company, a certificate for which was in his possession. About 11 o'clock in the forenoon of that day, he telephoned the firm of Lathrop, Haskins & Co., brokers dealing upon the New York Stock Exchange, to sell this stock; he having previously purchased it through them. This they did, selling upon the Exchange in the ordinary way, to the defendants, at 83⅝. The offer to sell and the acceptance to purchase were in writing, signed by the respective brokers in their own names, and the defendants had no knowledge that Lathrop, Haskins & Co. was not making the sale on its own account. After the sale, Lathrop, Haskins & Co. sent a notice in the usual form to Escher, stating the price at which the stock had been sold and naming the defendants as the brokers to whom the sale had been made. This notice was received by Escher, either late in the afternoon of the same day, or early the next morning. By the terms of sale the certificate of stock was to be delivered on the day following, when the purchase price was to be paid. The fact is not disputed that, under the rules of the Stock Exchange governing such transactions, if this contract had been fully performed in the ordinary course of business the stock would have been delivered to the defendants by Lathrop, Haskins & Co., and the purchase price paid to them, without Escher's appearing in the transaction at all. But on the day of sale, and shortly thereafter, Lathrop, Haskins & Co. notified the Exchange it was insolvent and unable to meet its obligations. An announcement of that fact was immediately made upon the floor of the Exchange, and then the defendants, in accordance with the rules of the Exchange applicable in such cases, proceeded to close all its contracts with the insolvent firm. They then had a number of contracts, both for the purchase of stocks from Lathrop, Haskins & Co. and for the sale of stock to them. The stock which they had contracted to purchase, they purchased from other brokers at prevailing prices, and the stock which they had contracted to sell, they likewise sold to other brokers, with the exception of the 25 shares of Columbus & Hocking stock, which was set off

against the 25 shares which they had contracted to purchase from them. Owing to the difference in prices at which these sales and purchases were made, a balance of $564.16 resulted in favor of Lathrop, Haskins & Co. which the defendants subsequently paid to the receiver in bankruptcy of that firm. On the morning following the failure of Lathrop, Haskins & Co., Escher, who had heard of it, called at the office of the defendants and presented to them his stock certificate, duly assigned and ready for transfer, with the notice of sale which he had received from his brokers, and a formal demand that the defendants take and pay for the stock. This they refused to do, and Escher thereafter assigned the stock, and all his right of action against the defendants in connection therewith, to the plaintiff, who thereupon commenced this action to recover the purchase price of the stock. The parties waived a jury trial, and the court found in favor of the plaintiff, for the full amount claimed. Judgment was entered accordingly, and defendants appeal.

The appellants contend that the judgment is erroneous because, under the rules of the Stock Exchange, Lathrop, Haskins & Co. and the defendants, in the transaction complained of, acted as principals, and after the failure was announced settlement was made in accordance with such rules. One of the rules referred to provides that:

"No party to a contract shall be compelled to accept a substitute principal, unless the name proposed to be substituted shall be declared in making the offer and as a part thereof."

Another:

"When written contracts shall have been exchanged, the signers thereof only are liable."

Also:

"When the insolvency of a member or firm is announced to the Exchange, members having contracts subject to the rules of the Exchange with the member or firm, shall without unnecessary delay, proceed to close the same. * * * *"

They contend that when Escher gave the direction to sell his stock he knew that Lathrop, Haskins & Co. dealt upon the Stock Exchange and that such dealings were subject to its rules. The defendants, undoubtedly, had the right to determine with whom they would contract. Arkansas Smelting Co. v. Belden Co., 127 U. S. 379, 8 Sup. Ct. 1308, 32 L. Ed. 246; Moore v. Vulcanite Portland Cement Co., 121 App. Div. 667, 106 N. Y. Supp. 393. And in Horton v. Morgan, 19 N. Y. 170, 75 Am. Dec. 311, it was said:

"The practice at the stock board, by which the brokers only and not their customers, are known in their dealings with each other, was not unreasonable; and the plaintiff, by directing this purchase to be made, must be understood as consenting that it should be done in the usual manner."

When Escher gave the order to sell, he also knew and intended that the sale would be made upon the Exchange, and there is much force in the claim that thereby the rules and usages of the Exchange, including the right to close the contract upon the insolvency of the broker, were imported into the contract by his authority. Bibb v. Allen, 149 U. S. 481, 13 Sup. Ct. 950, 37 L. Ed. 819; Springs v. James, 137 App. Div. 110, 121 N. Y. Supp. 1054; Skiff v. Stoddard, 63 Conn.

198, 26 Atl. 874, 28 Atl. 104, 21 L. R. A. 102, cited with approval in Richardson v. Shaw, 209 U. S. 365, 28 Sup. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981; Nickalls v. Merry, L. R. 7 H. L. Eng. & Ir. App. Cas. 330. If he did not know the rules of the Exchange, it was his own fault, and not that of the defendants. The notice of sale received by him from Lathrop, Haskins & Co. stated that the sale was "subject in all respects to the rules and regulations of the New York Stock Exchange," and this is undoubtedly what both of the brokers, who were parties to the transaction, intended. Under such circumstances, it is difficult to see, as urged by the appellants, how Escher could obtain any other or greater rights to enforce the contract than the brokers themselves had. Defendants certainly cannot be held liable upon a contract other than the one which they actually made, and if the one made were different from the one which Escher intended and authorized, then his remedy is against his agent and not against defendants.

In answer to the appellants' contention the respondent urges, and the decision of the Trial Court is upon the ground, that Escher was the undisclosed principal of Lathrop, Haskins & Co. and he could not be deprived of the benefit of his contract by the rules of the Stock Exchange making the brokers principals in their dealings with each other and prescribing the manner in which contracts shall be closed upon the insolvency of a member; in other words, that the relation of customer and broker in transactions upon the Exchange is, in general, subject to the ordinary rules and principles of agency. There is high authority for this claim. Leo v. McCormack, 186 N. Y. 330, 78 N. E. 1096; Hunphrey v. Lucas, 2 Carr. & Kir. 152; Cooke v. Eshelby, L. R. 12 App. Cas. 271.

[1] The conclusion, however, at which I have arrived, renders it unnecessary in the case now before us to determine whether the appellants' or respondent's contention is correct, because, assuming that the transaction is governed by the ordinary rules and principles of agency, irrespective of the rules of the Stock Exchange, I am of the opinion that the plaintiff was not entitled to recover. The contract was not for the sale of the specific shares of stock owned by Escher. It would have been fully performed by the delivery to the defendants of the requisite number of shares, regardless of their ownership, and the shares were not to be delivered and the purchase price paid until the next day. On January 19th, therefore, the contract was wholly executory, and if on that day Lathrop, Haskins & Co. had, before their failure, requested the defendants to cancel the contract, and they had consented to do so, it would have been at an end. The mere fact that Lathrop, Haskins & Co. were brokers would not have compelled defendants to inquire whether they had made the contract for an undisclosed principal and whether they had been authorized by him to cancel it. And for the same reason if, instead of canceling a single contract, Lathrop, Haskins & Co. had informed defendants they were unable to meet their obligations and requested them to close their contracts in the manner in which they were actually closed, I do not see how it can be doubted but that defendants would have been justified in complying with the request. Lathrop, Haskins & Co. actually had

with the defendants, at the time of their failure, several contracts for the purchase and sale of different stocks, involving many thousands of dollars.

To say that, under these circumstances, before taking any steps to protect themselves against loss, defendants would have been obliged to investigate each contract so as to find out whether an undisclosed principal were involved, and whether such undisclosed principal were able to perform, is to extend, as it seems to me, the right of an undisclosed principal beyond reason. No authority has, so far as I am aware, gone to that extent. But the announcement of the failure of Lathrop, Haskins & Co. upon the Stock Exchange, at their request, was equivalent to just such a request to defendants to close their contracts. For the purpose of the argument only, it may be assumed that if Escher had notified the defendants that the contract for the sale of the Hocking stock had been made for his account, before the announcement of the failure was made, and the brokers had thereby changed their positions, he might have enforced the contract. But he did not do so, and without having any actual knowledge that he or any one besides the insolvent brokers were interested, the defendants did close the contract by setting off their contract for the sale of an equal number of shares to the insolvents at a much lower price, thereby rendering themselves liable for the difference. It is possible Escher might have been entitled to this difference (Cooke v. Eshelby, supra); but, as is specifically stated in the respondent's brief, this action is not brought to recover the difference in price, and that question is not before the court. On the contrary, the respondent's claim is that, notwithstanding the settlement of the contract made by the brokers, Escher was entitled to enforce performance.

[2] The rule is well settled that the rights of an undisclosed principal are subject to claims acquired in good faith against the agent. McLachlin v. Brett, 105 N. Y. 391, 12 N. E. 17; Nichols v. Martin, 35 Hun, 168; Charlotte Iron Works v. American Exchange Nat. Bk., 34 Hun, 26; Hogan v. Shorb, 24 Wend. 458. This rule, of course, does not apply where the persons dealing with the agent know, or are chargeable with knowledge, of the existence of an undisclosed principal. Wright v. Cabot, 89 N. Y. 570.

The trial court held, relying upon certain English authorities, that the fact that Lathrop, Haskins & Co. were brokers dealing for others as well as themselves was sufficient to charge the defendants with such knowledge. But there is in this case the additional fact, not present in the English authorities relied upon, that the defendants actually closed their contracts with the insolvents at their request, by actual sales and purchases. It is difficult to see, if thereafter Escher could compel the defendants to perform, how any one could deal with safety with a person known at times to act as an agent. Here, the brokers, the only persons known to the defendants in the transaction, announced their inability to meet their contracts. That inability could very easily have been due to the inability of the principals in behalf of whom they had contracted. Yet, if this judgment is to be sustained, it must be held that the defendants had no right to rely upon this an-

nouncement and were bound to ascertain the identity of the real party in interest before closing any contract. The law is not so harsh and unreasonable. It imposes no such duty upon a person dealing with an agent known to act for himself as well as for others, especially where contracts made by such an agent and principal are as numerous and extensive as in the case before us.

I understand the law to be as stated in Le Marchant v. Moore, 150 N. Y. 209, 44 N. E. 770, where the plaintiffs had purchased stocks from the defendant brokers, through Evans & Co., plaintiffs' brokers. The purchase price had not been paid in full, so that the defendants retained the stock as pledgees for the unpaid balance. Haight, J., writing for the court, said:

"The defendants, as pledgees, were entitled to regard Evans & Co. as the owners until they were notified of the plaintiffs' rights. Thereafter they were bound to recognize the plaintiffs' claim and deal with the stock accordingly."

This expresses, as it seems to me, the only point which we are called upon to decide in the present case. At the time the defendants were notified of Escher's claim, their contract with Lathrop, Haskins & Co. had been terminated. What rights Escher may then have had, if he had any rights against the defendants at all, it is unnecessary, for the reason heretofore given, to determine. He certainly did not have the right to enforce a contract which they, in perfect good faith, and without any knowledge whatever of his interest, had closed at the request of his brokers.

The judgment appealed from must be reversed, and a new trial ordered, with costs to appellants to abide event.

INGRAHAM, P. J., and LAUGHLIN and CLARKE, JJ., concur.

MILLER, J. (dissenting). I am unable to assent to the proposition that the defendants are entitled to prevail in this action upon general principles of law, irrespective of the rules of the Stock Exchange. The defendants did not exercise their undoubted right of refusing to incur obligations to an undisclosed principal, but, without inquiry, they contracted with brokers in a market established exclusively for brokers. Perforce of the rules of that market, they and Lathrop, Haskins & Co. were principals inter sese; but they were bound to know that the latter might be dealing for an outsider. The rule, therefore, that an undisclosed principal must take the contracts of his agent, subject to the equities existing between the latter, and those contracting with him without knowledge of his agency, has no application to this case. It is the law in this state, as well as in England, that one dealing, under the circumstances disclosed in this case, with a broker, though nominally as a principal, may not set off as against the undisclosed principal a prior debt of the broker. Judson v. Stilwell, 26 How. Prac. 513; Wright v. Cabot, 89 N. Y. 571; Barring v. Corrie, 2 B. & Ald. 137; Cooke v. Eshelby, L. R. 12 App. Cas. 271. See, also, Glenn v. Garth, 133 N. Y. 18, 30 N. E. 649, 31 N. E. 344; Baxter v. Duren, 29 Me. 434, 50 Am. Dec. 602. A fortiori, he cannot set off a subsequent contract made with the broker.

In view of the way business is conducted in a market like the Stock Exchange, the defendants were equally bound to take into account the probability that the second contract was made for a different principal than the first. Without any agreement whatever, but assuming to act under the rules of the Stock Exchange, the defendants set off the second contract against the first, and paid the difference in favor of the first contract, $490.63, to the receiver in bankruptcy of the insolvent brokers. The other transactions between the two firms of brokers, which were closed in another way by the substitution of other contracts under the rules of the Exchange, are in no way involved in this case. It is suggested that perhaps the plaintiff's assignor was entitled to said sum of $490.63; but the appellants dispute even that, and no theory is suggested upon which it can be recovered. Said assignee, or his brokers for him, did not enter into a gambling contract with the defendants. He had 25 shares of stock to sell, his brokers made a contract to sell and deliver them to the defendants, and at the time for delivery he tendered the certificate, properly indorsed and stamped, and demanded the purchase price. This suit is to recover that purchase price. It may be that, if the defendants had substituted another contract by making a sale when the suspension of Lathrop, Haskins & Co. was announced, the plaintiff's assignor would have been bound by rules requiring him to accept the substituted purchaser and the difference between the purchase price of the first and the substituted contract. In that way, his rights would have been preserved, and everybody would have been protected. But it seems to me indubitable that he cannot be deprived of his bargain by a balancing of the accounts of the brokers inter sese, unless that result be required by the rules of the Stock Exchange.

The rules, quoted by my Brother McLAUGHLIN, with respect to substitute principals and to the signers only of written contracts being bound, relate, as the entire context of article 24 plainly shows, to the relations of brokers inter sese. The words "substitute principal" refer, not to an outsider, but to some other member of the Exchange than the original broker. Undoubtedly, the rules contemplate that, as between themselves, the brokers shall deal as principals; but if they are to have the effect contended for by the appellants, the necessary corollary is that the outsider and his broker also deal as principals, and the broker must be answerable to his customer for the execution of all contracts. To put the case concretely, suppose that the situation had been reversed and that the defendants had suspended; would Lathrop, Haskins & Co. have been bound to take the stock and pay the purchase price? If so, the rules would have the merit of consistency, and I am not sure but that in the long run they would work to the advantage of the outsiders, who would then be concerned only with the solvency of the broker selected by them; but the difficulty is that the corollary to the defendants' proposition is opposed to settled law and to the facts of this case. It is settled in this state by controlling authority that the outsider and his broker deal as principal and agent (Leo v. McCormack, 186 N. Y. 330, 78 N. E. 1096), and it is established as a fact in this case that the plaintiff's assignor

and Lathrop, Haskins & Co., dealt as principal and agent. In the notice of sale, the latter said:

We have sold this day *for your account and risk* (italics mine)

| Amount | Security | Price | Of Whom Bought or Sold |
|--------|----------|-------|------------------------|
| 25 | Hocking Coal & Iron | 83⅝ | De Coppet & Dor. |

Mr. Justice Greenbaum at Trial Term took the view that the rules with respect to the closing of contracts in case of the insolvency of a broker were mere domestic regulations, having no effect upon the rights of outsiders. That view is strongly supported by the English authorities cited by him. It is unnecessary for me to add anything to his discussion of them. The learned counsel for the appellants urges that the rules of the London Stock Exchange differ from those involved in this case in that the former contemplate an artificial liquidation, whereas under the latter the closing is to be effected by actual purchases and sales. It is sufficient to say on that head that, in so far as the contract involved in this case is concerned, the closing was in every respect as artificial as that provided by the rules of the London Stock Exchange; the only difference being that in this case the balance struck was paid to the receiver of the insolvent, whereas under those rules it would have been paid to an official assignee. I shall not paraphrase what Mr. Justice Greenbaum has well said on that aspect of the case, but shall consider it from a different standpoint.

The rules of the Stock Exchange are to be construed with a view to their purpose. The first article is illuminating. I quote:

"The title of this association shall be the 'New York Stock Exchange.'

"Its object shall be to furnish exchange rooms and other facilities for the convenient transaction of their business by its members, *as brokers*." (Italics mine.)

Of course, it is the law that one, who employs another as agent to deal in a particular market, is bound by the rules of that market, whether he knows them or not; but that rule has its limitations, which are suggested by every one of the decisions cited in support of it. One of those limitations is that, to be binding on outsiders, the rule must be reasonable and must not change in any essential particular the character of the undertaking. Harker v. Edwards (1887) 57 L. J. (N. S.) 147; Skiff v. Stoddard, 63 Conn. 198, 26 Atl. 874, 28 Atl. 104, 21 L. R. A. 102; Bilb v. Allen, 149 U. S. 481, 13 Sup. Ct. 950, 37 L. Ed. 819; Lawrence v. Maxwell, 53 N. Y. 19. There is more in this case than even an attempt to change the intrinsic character of the undertaking. Lathrop, Haskins & Co., as agents for the plaintiff's assignor, contracted to sell 25 shares of stock to the defendants. By an artificial liquidation, that contract was canceled, and the outsider has nothing in its place. He cannot look to the estate of the insolvent for the performance of his contract or for damages as for its breach, for the insolvent agreed to act only as agent and carefully guarded against personal responsibility to him by selling for his "account and risk." He did not make a wager on the decline in the market price of the stock. If he had, he might complain, but not in a court of law, because his winnings had been

turned over to another. He still has his stock, whereas he contracted to sell it; and any rule which deprives him of his bargain without at least substituting another in its place is not binding upon him for the reason that it not only changes the intrinsic character of the undertaking, but as to his annuls it. The suggestion that it would be harsh and unreasonable to require members of the Stock Exchange to recognize the contract rights of outsiders entirely overlooks the fact that such members deal in a market established for the very purpose of enabling them to deal *as brokers,* and hence for outsiders. They therefore cannot make rules, or construe those already made, so as to destroy the rights of their principals. As I have already indicated, it would not be difficult to close the contracts of an insolvent broker by substituting other contracts at current prices in such a way as to protect the rights of both brokers and outsiders. In the last analysis, the question really is whether the undisclosed principal may overtake a contract made for him in the Stock Exchange. The proposition is not open to discussion, at least in this court, that there is privity of contract between the outsider and those with whom his broker deals. Leo v. McCormack, supra; Clews v. Jamieson, 182 U. S. 461, 21 Sup. Ct. 845, 45 L. Ed. 1183; Richardson v. Shaw, 209 U. S. 365, 28 Sup. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981; Hunphrey v. Lucas, 2 Carr. & Kir. 151.

There is nothing in our recent decision in Springs v. James, 137 App. Div. 110, 121 N. Y. Supp. 1054, affirmed 202 N. Y. 603, 96 N. E. 1131, opposed to the foregoing views. That was an action by a cotton broker to recover money expended for his customer; the defense being that the plaintiff's dealings in the New York Cotton Exchange were gambling transactions. The validity of the clearing house rules providing for the so-called ring settlement was involved. Those rules were sustained upon the theory that the contracts were made in contemplation of actual delivery, that set-off was equivalent to payment or delivery, and that there were always in existence contracts upon which delivery could be made or required. While it might be difficult at a precise moment in the ringing-out process, as must be the case in the practical operation of any clearing house rule, to put one's finger on the particular contract to which a given customer would be entitled, there was always a contract for the customer in case he demanded or wished to make actual delivery. The customer, who only knew his broker, was so far bound by the rules that he could not insist upon a particular contract. Mr. Justice Clarke, who wrote for the court in that case, cited, among others, the case of Clews v. Jamieson, supra, in which the court held that there was privity of contract between the outsider and a substituted purchaser under the clearing house rule, although the contract of such purchaser was one to buy more shares than had been contracted to be sold for said outsider. Plainly, then, there was privity of contract between the plaintiff's assignor and the defendants. I think none of us entertains any doubt but that, if the price of the stock had risen, he would have been called upon to make delivery. It happened to decline; but still I think he was entitled to his bargain, and therefore vote to affirm the judgment.