In the Matter of CHINESE MERCHANTS BANK, LTD., NEW YORK AGENCY, in Liquidation.*

Supreme Court, New York County, January 18, 1934.

* Affd., Supreme Court, New York County, March 22, 1934.

*Samuel L. Chess*, for the administrator.

*Curtin & Glynn [Winfield S. Palmer* of counsel], for the Superintendent of Banks of the State of New York.

H. H. NORDLINGER, Referee. The Superintendent of Banks having taken over the Chinese Merchants Bank, Ltd., New York Agency, on June 13, 1924, and having thereafter proceeded to liquidate its affairs, applied to the Supreme Court for leave to pay a final dividend of sixty-seven per cent (a dividend of thirty per cent having been previously paid), and for a final settlement of his accounts in such liquidation. Certain issues having arisen on the accounting between Stanley L. Montanye, the administrator of the estate of Chu Fong, a deceased claimant, and the Superintendent of Banks as liquidator, these issues were by a resettled order dated November 2, 1933, referred to the undersigned to take testimony and report. Pursuant to that order, I have taken testimony and briefs on the issues so referred.

The dispute between these parties with regard to certain matters of computation was taken out of the reference by agreement of the parties. This agreement leaves to be considered only the right of the Superintendent to assert a set-off against the claim of the administrator against the bank, which had theretofore been allowed by the Superintendent in the sum of $12,066.03. The set-off is opposed by the administrator. The case is thus the reverse of the usual situation in which a set-off is claimed by the creditor and opposed by the liquidator. The reason for this reversal of the usual situation is that in the instant case, the closed bank, while technically insolvent, is yielding in liquidation ninety-seven per cent

of the face value of the claims against it, while creditors of the estate of Chu Fong, the deceased claimant, are still unpaid, although five years have elapsed since his death.

Both the claim of Chu Fong against the bank and the claim of the bank against Chu Fong are conceded, and the only question is whether one may be offset against the other.

Chu Fong in his lifetime was the owner of a dry goods store at No. 10 Doyers street in Chinatown, New York city. He appears to have been a person of importance in the Chinese community in New York city. It appears by the testimony of his son, Kang Chu, that he was in the habit of accommodating fellow-countrymen who desired to transmit money to China, by taking their money, turning it over to the bank which is now in liquidation, and procuring for them drafts payable in the alternative to persons or institutions in China or to bearer. For a time he seems to have possessed and exercised authority to sign such drafts for the bank. At other times he procured drafts signed by other persons on behalf of the bank. When the bank was taken over by the Superintendent on June 13, 1924, a number of these drafts were outstanding. The purchasers of a number of them testified that they took the drafts to Chu Fong and asked him to file proofs of claim for them with the Superintendent, and that he undertook to do so.

Altogether, Chu Fong filed claims with the Superintendent on drafts aggregating $12,066.03, which claims were allowed by the Superintendent. These claims were filed by Chu Fong in his own name; and no claim appears to have been made by him up to the time of his death on October 10, 1928, that they belonged to any one else. It is the present claim of his administrator, however, that none of the claims were actually his property, but that all of them belong to the respective purchasers of the drafts, who are claimed to have bought them through the medium of Chu Fong in the manner described above.

During a period likewise preceding the closing of the bank, Chu Fong was conducting certain foreign exchange transactions with the bank, as a result of which he was at the time of the closing of the bank indebted to it in the sum of $17,000. He arranged to pay this indebtedness off in installments, and up to the time of his death in 1928 had made payments sufficient to reduce this indebtedness to $7,507.58. This indebtedness in the last-mentioned sum is undisputed. It is this balance which the Superintendent seeks to offset against the claim of the administrator.

The administrator invokes the well-settled rule that a counter-claim or set-off is not permitted unless the mutual claims are not only between the same parties but between these parties in the

same capacity. (Civ. Prac. Act, §§ 267, subd. 3, 268, 269; 57 C. J. " Set-off and Counterclaim," p. 453, § 103; 7 id. " Banks and Banking," p. 745, § 535; and see *Dakin* v. *Bayly*, 290 U. S. 143; 54 Sup. Ct. Rep. 113, 115.)

The Superintendent, while, of course, not questioning this well-settled rule, contends, *first*, that the rule is not applicable because the decedent, if acting as an agent, was acting as agent for undisclosed principals; and *second*, that, in any event, the evidence does not suffice to establish that the decedent was acting otherwise than in his own interest, excepting with respect to claims totaling an amount insufficient to defeat the right to a set-off.

To allow a third party who has a personal claim against an agent to offset this claim against a sum owing from the third party to the principal, is in effect to allow the third party to use property belonging to the principal in payment of a debt of the agent. Considered by itself, this result is plainly unjust to the principal; and hence, it ought not to be permitted unless paramount supervening equities require it. Where the third party has been misled into believing that he is dealing with the principal, when in truth the party whom he supposed to be the principal is only the agent for an undisclosed principal, and where on the faith of that belief, he has allowed a state of accounts to come into existence under which he would be entitled to the offset if his belief were true, it is no more than just that the principal and not the third party should suffer the consequence of the erroneous belief for which the principal and not the third party is responsible. But the rule allowing a third party under certain circumstances to offset against an undisclosed principal the third party's claim against the agent, is no broader than the reason from which that rule originated. Thus, where the third party had reason to believe that the agent was acting as agent and not as principal, even though he did not know the identity of the principal, he is not entitled to claim the set-off. (*Wright* v. *Cabot*, 89 N. Y. 570.) All the authorities (Williston Cont. § 291; 2 C. J. " Agency," p. 877, § 561; *F. T. Banking Corporation* v. *Gerseta Corp.*, 237 N. Y. 265; *McLachlin* v. *Brett*, 105 id. 391; *Wright* v. *Cabot, supra*) recognize these limitations on the rule, including the authorities cited by the Superintendent (*Kent* v. *DeCoppet*, 149 App. Div. 589, 595; *Pollacek* v. *Scholl*, 51 id. 319, 320).

The only basis for the contention of the Superintendent that the set-off ought to be allowed on the ground that the decedent, if an agent, was an agent for an undisclosed principal, is that the proofs of claim were filed by the decedent in his own name. But this fact is plainly not sufficient to bring into operation the rule invoked

by the Superintendent; for the claim of the bank against the decedent had, of course, arisen before the closing of the bank, and hence long before the filing of the proofs of claim with the Superintendent. Accordingly, I hold that the authorities cited by the Superintendent are not controlling. It, therefore, becomes necessary to pass upon the second question raised by the Superintendent, namely, whether the evidence sufficiently establishes that the claims were not the property of the decedent, or whether, on the contrary, it establishes that they were. In considering this question, I assume that the burden of proof is on the Superintendent to establish that the set-off is valid.

The administrator produced fifteen witnesses who testified that they had respectively purchased drafts through the decedent in the manner described above, and that when the bank was taken over by the Superintendent, they brought their drafts to the decedent, who undertook to file proofs of claim for them. Most of these witnesses appeared as a result of an advertisement in the Chinese newspapers published in New York city asking the owners of certain enumerated drafts to appear and testify before the referee. In view of the length of time that had elapsed since the transactions involved and the difficulty of locating these witnesses, no criticism attaches to this method of locating the witnesses.

The testimony of certain of these witnesses was impeached, in my opinion successfully, by the cross-examination of counsel for the Superintendent. I believe and accept the testimony of those of these witnesses who were not so impeached.

The aggregate amount of the drafts as to which I accept the testimony that they were the property of the respective witnesses and not of the decedent, is only $1,905.83. Even if the testimony of all fifteen witnesses were to be accepted, the aggregate of the drafts covered by their testimony is only $3,857.88. If the remaining drafts, amounting to over $8,000, were the property of the decedent, the amount of that part of the claim belonging to the decedent is greater than the amount of the claimed set-off, and the set-off must still be allowed in full.

As evidence that the remaining drafts were the property of the decedent, we have, *first*, the legal presumption arising from the fact that they were produced from his possession and annexed by him to the proofs of claim filed by him with the Superintendent of Banks (Wigm. Ev. § 2516; Neg. Inst. Law, § 28, subd. 2); *second*, the fact that he filed the proofs of claim in his own name, and as far as appears, made no suggestion during the three or four years that he lived after filing the proofs of claim that the drafts were not his own property.

Against this we have only the general testimony of the decedent's son, Kang Chu, to the effect that all of the drafts on which proofs of claim were accepted by the Superintendent were the result of transactions similar to those described above. While I was very much impressed with the truthfulness of Kang Chu as a witness, I do not believe that he intended to testify that he knew of his own knowledge that each of the transactions on which proofs of claim were filed by his father was the kind of transaction described above. At the time of these transactions he was only a clerk in his father's store, and was only twenty-one or twenty-two years of age. It appears affirmatively in the record that he was without personal knowledge as to at least some of the transactions involved. I think the witness intended only to testify to his knowledge of the general course of dealing, and not to personal knowledge of each individual transaction.

Even if Kang Chu's testimony were considered proof that the course of dealing as to all the drafts included in the claim of the administrator, was the same as that with respect to the drafts listed in Schedule A,* there is no proof in the record who were the owners of the drafts not listed in either Schedule A or B.* The itemized list of decedent's claims as filed with the Superintendent (Superintendent's Exhibit E in this proceeding) lists the persons or institutions named as the respective payees of the drafts; but so far as appears from the instances as to which there is evidence in the record, the named payee was not always or even usually the same person as the purchaser of the draft.

I conclude, therefore, that the drafts other than those listed in Schedule A* were the property of Chu Fong, and are the property of his estate.

There is an additional reason in support of this conclusion. The administrator's contention is that the ownership of the claims in question was not in the decedent who filed them, but in other individuals; and that the decedent filed the proofs of claim simply as agent or trustee for those individuals. But if this contention were to be sustained, the administrator would have no standing whatever in this proceeding. Neither the authority of an agent (2 C. J. " Agency," § 184) nor that of a trustee (Pers. Prop. Law, § 20) survives the death of the fiduciary. In the former case, all authority of the agent reverts to the principal. In the latter, the powers of the trustee vest in the Supreme Court. It is accordingly extremely doubtful whether the administrator has any standing whatever to make the claim which he makes in this proceeding.

---

* Schedule omitted.

Accordingly, I find and report, *first*, that the drafts listed in Schedule A* and the claims thereon are respectively the property of the individuals listed under the heading " Witness " in that schedule; *second*, that all the remaining claims filed by the decedent Chu Fong are the property of the decedent and of his estate; and *third*, that the set-off claimed by the Superintendent should be allowed in full.