CHARLES H. W. MANDEVILLE *et al. vs.* MILTON W. POOLER.

MARCH 29, 1938.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CONDON, J. This is an action of assumpsit which was tried before a justice of the superior court sitting with a jury and resulted in a directed verdict for the plaintiff in the sum of $99.08, plus interest. The plaintiff's motion for a directed verdict in the sum of $4030.58, with interest, was denied by the trial justice and to this ruling the plaintiff excepted.

The case is now before us on the plaintiff's bill of exceptions setting out this exception and others taken during the trial. However, the plaintiff is now relying solely on its exception to the denial of its motion for a directed verdict in the sum above mentioned.

The facts are undisputed. They arise out of certain relations between the defendant and the brokerage firm of Mandeville, Brooks & Chaffee, hereinafter referred to as Mandeville, in the purchase and sale of several lots of "when

issued" stock in the fall of 1929. On divers days of that year, namely, August 7, October 5, 16 and 17 and November 4, the defendant ordered, through Mandeville, said lots of stock. On September 19, 1929, he sold through the same brokers one lot of one hundred shares of said stock. These stocks had been admitted to trading on the New York Curb Exchange. However, transactions in them were not cleared on the day following, as were transactions in actually issued stock, but on the day when the stock was actually issued. A purchaser of such stock consequently was not entitled to receive the stock purchased until it was actually issued.

The defendant's orders for this stock were handled for him by Mandeville on their marginal account with F. B. Keech & Company, a New York brokerage firm, hereinafter referred to as Keech. When these orders were put through, his brokers did not receive actual stock but merely a notice that the orders had been put through and that the proper entry had been made in the account of Mandeville with Keech. In putting through these orders, Keech entered into written contracts with a firm of New York Curb brokers binding Keech to pay for said stock if, as and when issued. Keech required Mandeville to keep these orders properly margined.

Mandeville did not debit defendant on their books when purchases were made or credit him when sales were made of said "when issued" stock. One block of said stock was issued on November 22, 1929, and the remainder on April 2, 1930. The defendant, however, was neither debited, on Mandeville's books for purchases, nor credited with sales, until after Mandeville had failed and after the date of November 22, 1929.

On November 18, 1929 Mandeville became insolvent and was suspended from the New York Stock Exchange and the New York Curb Exchange. On November 21, 1929, Keech finally closed out the Mandeville contracts for the purchase of the "when issued" stocks in question here. No tender of these stocks was ever made to the defendant either by the

receiver in equity of Mandeville or by their trustee in bankruptcy.

The defendant had a margin account with Mandeville until the latter part of October, 1929. On or about October 28, 1929, he ordered this account transferred to the Rhode Island Hospital Trust Company and this was done by Mandeville. According to the defendant's testimony, which was not contradicted, it was understood by Mandeville that the bank was to take over and pay for the "when issued" stocks when deliverable and this is corroborated by the following letter addressed to the bank by Mandeville, Brooks & Chaffee:

"October 28, 1929.

R. I. Hospital Trust Company
Providence, R. I.

Gentlemen:

We have today received instructions from Mr. Milton W. Pooler to deliver to you as soon as payable two hundred (200) shares of Middle West Utilities Common New Stock and two hundred (200) shares of General Gas & Electric 'A' new.

Will you kindly confirm these instructions to us.

Very truly yours,

Mandeville, Brooks & Chaffee
By: (Signed) R. Thornton."

Defendant admits that the last purchase of two hundred shares of "when issued" Middle West Utilities New Stock made on November 4, 1929 and incorrectly debited on November 6, 1929, was not covered by the above letter, but he testified that the same arrangements as made in that letter were made as to this item. The state of the defendant's account with Mandeville is shown by entries made by them up to November 18, 1929 only, as subsequent entries were made by either their receivers in equity, their trustee in bankruptcy or by the M. B. C. Company.

The M. B. C. Company is a Rhode Island corporation which was organized in June 1930, in accordance with a composition plan approved by the United States District Court for the District of Rhode Island, for the purpose of taking over, collecting and liquidating the remaining assets of Mandeville for the benefit of creditors. After their insolvency Mandeville first went into a state receivership in equity in the superior court but later they were adjudicated bankrupts and their affairs were finally administered in the bankruptcy court.

Sufficient facts have been stated, we think, to make clear just what this case is about and also to understand properly the contentions of the parties. As the M. B. C. Company is the real party plaintiff in interest, it will be hereinafter referred to as the plaintiff.

The plaintiff contends that the defendant is liable for the transactions in these "when issued" stocks, because the acts of Mandeville in arranging for the purchase of said "when issued" stocks, were the acts of the defendant, as principal, and therefore that all necessary expenditures and losses resulting to Mandeville, as agents, from the performance of the agency are legally chargeable to the defendant.

It is admitted by the defendant that in the execution of orders for the sale or purchase of securities the ordinary relationship of the customer to his broker is that of principal and agent. That is the law of this state; *Leand* v. *Clark, Childs & Co.*, 53 R. I. 479, and it is also the law generally. Meyer, Law of Stockbrokers and Stock Exchanges, § 39, 1, (1931 ed.) p. 249. A broker may, however, deal in securities on his own account, in which case his relation to his customer is that of vendor and vendee. *In re B. Solomon & Co.*, 268 Fed. 108. In the instant case the defendant expressly admits in his brief that in each of the transactions in question the relation between him and Mandeville was that of principal and agent.

The general rule is well settled that a principal must indemnify his agent against the consequences of all acts legally and reasonably done by him in the execution of his agency. And it has been held that this general rule applies in the case of the employment of a broker to sell property for future delivery. *Bibb* v. *Allen*, 149 U. S. 481; *Bailey & Graham* v. *Phillips*, 159 Fed. 535; *Rothchild* v. *Abeles*, 9 N. J. Misc. 901, 155 A. 755. See also Meyer, Law of Stockbrokers and Stock Exchanges, p. 450.

We understand the defendant to agree that this is undoubtedly the law and that it applies to the purchase of stock on margin, but to contend that it is also the law that the broker undertakes on his part to deliver the securities. And he further contends that, if the broker allows his contract, for the purchase of the securities ordered, to be closed before delivery, he has breached his duty as agent and cannot, because of losses suffered thereafter by reason of said breach, claim reimbursement from his customer.

There can be no question that the broker, unless prevented by causes for which he is not legally responsible, must first perform his duty to his principal before he is entitled to repayment and reimbursement for expenditures and losses. Delivery of stock purchased on the New York Stock Exchange or New York Curb may be contracted for in various ways but in the absence of stipulation it will be assumed that the contract is for delivery in the regular way upon the next full business day following the contract. *Provost* v. *United States*, 269 U. S. 443. The broker undertakes and agrees to deliver the stock ordered by his customer and is entitled to payment only if able to make such delivery. *Tuell* v. *Paine*, 39 Misc. 712, 80 N. Y. Supp. 956, affirmed on memorandum, 89 App. Div. 615, 85 N. Y. Supp. 1149; *Katz* v. *Nast*, 187 Fed. 529. See also *Markham* v. *Jaudon*, 41 N. Y. 235.

The difficulty in the instant case arises over the fact that the controversy between the parties concerns not the ordi-

nary purchase of stock, either for cash or on margin, but transactions involving the purchase of so-called "when issued" stocks not in existence at the time of defendant's orders to Mandeville nor at any subsequent time down to at least the fourth day after November 18, 1929, on which date Mandeville became insolvent and when, under the rules of the curb exchange, all of their contracts were immediately closed out. Keech, as said above, finally liquidated the contracts which they had with Mandeville as to these "when issued" stocks on November 21, 1929, which was prior to the date of issue of any of such stock.

It appears from the evidence that the rules of the curb exchange require that transactions in "when issued" stocks shall be evidenced by written contracts, between the brokers who are involved therein, on the day following the transactions, and only the brokers signing these written contracts are liable. The brokers in such case, according to the evidence, act as principals. Mandeville caused these written contracts to be entered into on its behalf by Keech in order to be able to make delivery of the stocks to the defendant when the stocks were issued. Since, as agents of the defendant, it was their duty to deliver the stocks upon payment therefor by the defendant, it was the duty of Mandeville to keep these contracts open so as to be in a position to be able to deliver these stocks when they were issued.

When the defendant gave Mandeville each order to procure for him shares of these "when issued" stocks at a certain price, and Mandeville accepted that order, a contract was made between them. Mandeville thereby promised that, unless they were prevented from so doing by some cause for which they were not responsible, they, as defendant's agents, would procure for him such shares at that price, when, as and if issued, and would thereafter promptly deliver such shares to him. The defendant on his part made a promise to Mandeville that, if they, as his agents, performed their promise and delivered the shares to him accord-

ingly, he would then pay them the purchase price for the shares and their commission for procuring them for him. Defendant made a further promise to Mandeville, as a part of this contract, that if they were unable, from some cause or causes for which they were not responsible, to procure and deliver to him the shares, he would indemnify them for any loss that they suffered, from any cause or causes for which they were not responsible, in properly trying to perform their promise to him.

Here Mandeville performed their promises only to the extent of causing Keech, as their agent, to enter into contracts by means of which Mandeville was to get for the defendant, at the stated price, the shares that he had ordered, when, as and if such shares were issued, and also to the extent of maintaining a sufficient margin with Keech to protect Keech from loss by reason of entering into the latter contracts in Mandeville's behalf.

But Mandeville, because of their insolvency and the appointment of a receiver for their assets and business—a cause for which they were legally responsible—never received the shares for the defendant and they never delivered or offered to deliver to him any shares of such stocks, nor did any of the receivers for their assets and business or the later trustee in bankruptcy. Therefore, by reason of the nonperformance, by them or any of their successors, of a condition precedent to any liability by the defendant on his promise to pay Mandeville for the shares ordered by him, or on his promise, on certain conditions, to indemnify them for any loss suffered by them in properly trying to perform their promise to him, he is not liable to them for a breach of either of these promises.

It is obvious that it was the bankruptcy of Mandeville, on November 18, 1929, which prevented them from delivering such shares, and that was a cause for which they are legally responsible. It is well established that bankruptcy of itself may be deemed a breach of the bankrupt's contracts. *In re*

*Pettingill & Co.*, 137 Fed. (D. C.) 143; *Drake* v. *Hodgson,* 192 App. Div. (N. Y.) 676; *Central Trust Co.* v. *Chicago Auditorium,* 240 U. S. 581. Bankruptcy is a complete disablement of the bankrupt to perform and therefore amounts to a repudiation of the bankrupt's contracts, subject, however, to the right of the trustee to perform the contracts if possible. *Stern* v. *Mayer,* 166 Minn. 346, and cases cited therein. The closing out by Keech on November 21, 1929, in accordance with the rules of the exchange, of the contracts to purchase the "when issued" stocks, made it impossible for Mandeville to perform their contracts with the defendant. Their trustee in bankruptcy or their receivers in equity might have rehabilitated these contracts and thus put themselves in a position to perform later the bankrupt's contracts with the defendant, but this was not done nor was any tender of these stocks made to the defendant after they were issued.

Plaintiff contends that notwithstanding the law above discussed and the facts above stated, it is entitled to recover because rights for the benefit of, and obligations binding upon the defendant were created by the exchange of contracts between the brokers in New York, and that when the defendant's orders to purchase these "when issued" stocks had been executed by means of the contracts, which Keech had entered into at the instance of Mandeville, the latter had performed their contract with the defendant to the extent that the defendant had obtained valuable property rights. We are of the opinion that these rights are, as said above, purely executory contract rights and not property rights in the sense in which plaintiff relies upon them in support of its contention.

As we understand the defendant's orders, they were to buy stocks of certain designated companies for delivery when such stocks were issued. Unless and until Mandeville received these stocks for the defendant, the condition precedent to their being able to deliver them to the defendant

was not fulfilled and their contracts with defendant remained unperformed. Those contracts were still unperformed and in an executory state on the day Mandeville became insolvent. On that day a breach of the contracts occurred which excused the defendant from any further obligation. Any loss on these contracts which resulted to Mandeville subsequently to that date were due to their own breach. The losses suffered by virtue of the closing out of their contracts with their New York correspondent, in accordance with the rules of the curb exchange, were due directly and solely to their bankruptcy. The fact that they were the agents of the defendant in these transactions does not give them any privileged standing. The results of their bankruptcy are chargeable to them, and this view is in accord with the law of principal and agent.

The plaintiff makes a further contention, that the bankruptcy of Mandeville does not affect its right of recovery, and in support of this contention it cites several cases. *Otis v. Medoff*, 311 Pa. 62, 166 A. 245; *Palley v. Worcester County National Bank*, 195 N. E. (Mass.) 717; *Capron v. Thompson*, 86 N. Y. 418. None of these cases appear to us to be in point on the facts of the instant case, as they did not have reference to contracts for the purchase of "when issued" stock and also it was clear in each of them that the broker as agent had fully performed his duty to the customer as principal.

But the plaintiff contends that, because the defendant in the instant case was a broker, he must be charged with notice of the rules of the New York Curb Exchange and that one of these rules required the liquidation of the account of a member of the exchange in the event of his insolvency. These rules, it contends, were binding in transactions between a member and his customer, as well as between members, and it quotes the following from Meyer, Law of Stockbrokers and Stock Exchanges, (1931 ed.) p. 157: "A customer who employs a broker to transact business on a particular exchange

or market impliedly authorizes the broker to transact the business in accordance with the customs, usages and rules prevailing on that exchange or market." The cases cited by the author in support of this statement concern compliance with rules governing the actual execution of an order on the exchange. Later, however, on page 168, the author deals in the following language with rules which require the closing out of the account of a member of the exchange upon his insolvency: "These rules have been sustained as valid and binding, both on the customer of the insolvent broker and on the customer of the broker with whom he has contracted." Only one case is cited by the author in support of this statement—*Kent* v. *DeCoppet,* 149 App. Div. 589—and it has also been cited in the plaintiff's brief, but apparently not for this particular contention.

The *Kent* case, it may be observed, is not at all like the instant case. There the customer of the insolvent broker attempted to hold liable the other broker, who properly closed out the insolvent's account in accordance with the rules of the exchange, but here the insolvent brokers, through the assignee of their trustee in bankruptcy, are attempting to hold their own customer liable for the closing out of their contracts with their correspondent in New York, due to their own insolvency.

The plaintiff finally relies on the following contention as stated in its brief: "Even assuming that the defendant was not bound by the rules of the Curb Exchange and that the sale of his stock by Keech was wrongful and accordingly amounted to a conversion, such facts, we submit, do not affect the plaintiff's right to recover in this action. It is well settled as a matter of law that a broker's claim to recover a customer's indebtedness is not extinguished by a wrongful hypothecation or other conversion of his customer's securities, or by his inability because of such hypothecation or conversion to perform his duty to his customer with respect to delivery."

In support of this contention the plaintiff cites and discusses at considerable length numerous authorities which need not be set out here, as the defense in the instant case rests, not on any wrongful hypothecation or conversion of defendant's securities by Mandeville after they had obtained them, but rather on the fact that by their own act, namely, insolvency, Mandeville put it beyond their power to complete their contracts with defendant and obtain for him the stocks ordered. In other words, the principle of law laid down in the cases cited by the plaintiff does not apply to the instant case, because the defendant's brokers had never performed their contracts to their customer, even to the extent of obtaining the stocks which he had ordered.

In each of the cases cited, the broker had fully performed his duty as an agent to the principal and the relation between them had become that of pledgee and pledgor. The question was what was the extent of the liability of the broker as pledgee for wrongfully repledging or otherwise converting the stock to his own use. In the instant case, on the contrary, the relation between Mandeville and the defendant never changed from that of agent and principal to that of pledgee and pledgor. Plaintiff's final contention is, therefore untenable.

For the reasons above stated, the trial justice did not err in denying the plaintiff's motion for a directed verdict in the sum requested by it.

The plaintiff's exception to the denial of its motion is overruled and the case is remitted to the superior court for entry of judgment on the verdict as directed.

*Elmer E. Tufts, Jr., Edward T. Richards, Edwards & Angell,* for plaintiffs.

*Frank F. Mason,* for defendant.