EDWARD L. CRUSIUS, Plaintiff, v. WALTER C. LOUCHHEIM and Others, Defendants.

Supreme Court, New York County, July —, 1928.

Brokers — stockbrokers — plaintiff held " put " for 100 shares of stock issued by brokers —" put " defined — plaintiff directed defendants, his brokers, to exercise " put "— issuing brokers signed " comparison ticket " and defendants purchased stock on exchange — stock was tendered to issuing brokers next day but refused because of their financial failure — notice of sale given to plaintiff provided that sale was for his " account and risk "— rules of Stock Exchange do not make parties hereto vendor and purchaser — relationship of principal and agent continued — plaintiff may not recover value of shares purchased.

The plaintiff held a " put " for 100 shares of corporate stock. A " put " gives the holder an option to sell stock either to the maker or indorser thereof at a certain price and on or before a certain date. When the stock had declined to a point where it was profitable for the plaintiff to exercise its " put," he directed the defendants, his brokers, to make the sale to the issuing brokers. The issuing brokers signed a " comparison ticket," which is a form of contract of purchase and sale, and on the same day the defendants purchased the stock on the exchange for tender to the issuing brokers. The stock was tendered the next morning prior to the opening of the Stock Exchange, but was refused and the issuing brokers were suspended because of their financial failure a few moments after the exchange opened. The notice of sale sent by the defendants to the plaintiff stated that defendants had sold the stock for the " account and risk " of the plaintiff. After the refusal of the issuing brokers to take the stock, the defendants notified the plaintiff that the first notice of sale was voided because of the failure of the issuing brokers. The rules of the Stock Exchange provide that when written contracts shall have been exchanged, the signers thereof are only liable, and that no party to a contract shall be compelled to substitute a principal unless the name proposed to be substituted shall be declared in making the bid or offer. Those rules are for the benefit of the brokers who are thereby authorized to hold each other as principal to the contract, but they do not do away with the doctrine of principal and agent as between a client and his brokers. Therefore, the defendants and the plaintiff did not occupy the relation of vendor and purchaser and when the defendants purchased the shares in the exercise of the " put," they purchased as agents for the plaintiff and they are not liable to him for the value thereof.

Accordingly, plaintiff's motion for summary judgment is denied.

MOTION by plaintiff for summary judgment.

*Philip C. Samuels* [*Philip C. Samuels* and *Max Lazarus* of counsel], for the plaintiff.

*Stroock & Stroock,* for the defendants.

COTILLO, J.   Plaintiff in an action against a firm of stockbrokers asks for summary judgment and judgment on the pleadings.   The essential point at issue centers about the legal effect of a transaction in which defendants represented the plaintiff in dealing with another broker.   The facts in brief are that the plaintiff opened and conducted a margin account with the defendants for the purchase and sale of securities.   No question is raised with respect to any of the transactions in that account, except the matter arising out of an option known as a " put " of 100 shares of Manhattan Electrical Supply Company stock.   The acquisition of a " put " gives the holder an option to sell stock either to the maker or indorser thereof at a certain price and on or before a certain date.   There are what are known as " put and call " brokers, who are not members of the New York Stock Exchange and whose special business is to buy and sell these options.   The defendants purchased for plaintiff a " put " on 200 shares of Manhattan Electrical Supply Company stock at 92, expiring August 17, 1927.   The transaction on 100 shares was entirely consummated, and only the remaining 100 are at issue. This particular option was made by A. L. Fuller & Co., a member of the New York Stock Exchange, in good standing at the time the " put " was purchased.   It only becomes profitable for a holder of a " put " to exercise it when the stock is selling on the Exchange for a price lower than that named in the option.

When the defendants held the " put " for the plaintiff, plaintiff did not own any Manhattan Electrical Supply Company stock. On August eleventh this stock was selling on the Exchange at or about seventy-eight dollars a share, which would enable the plaintiff to exercise it at his profit.   He then directed the defendants to exercise the option and the defendants then went on the floor of the New York Stock Exchange and purchased these 100 shares of stock at seventy-eight dollars per share so that the plaintiff would have the stock to present.   The propriety of this purchase is in no manner questioned by the plaintiff.

Defendants, on this same day, notified A. L. Fuller & Co. that it was exercising this option and A. L. Fuller & Co. signed what is known as a " comparison ticket."   This " comparison ticket " is a form of contract of purchase and sale in use on stock exchange transactions and formed the contract of purchase and sale in this particular case.   In transactions of this type, which are common and ordinary transactions, delivery is made on the

day following the signing of the " comparison ticket." On the morning of the following day, August twelfth, at or about nine-forty-five, which was prior to the opening of the New York Stock Exchange, the defendants tendered to A. L. Fuller & Co. these 100 shares of stock and demanded payment therefor. Fuller did not take in the stock and approximately half an hour later, which was about fifteen minutes after the opening of the New York Stock Exchange, the suspension of this firm from membership on the Exchange was announced as a result of its failure to meet its obligations, one of which was its inability to take in and pay for the plaintiff's 100 shares of Manhattan Electrical Supply Company stock. Fuller's financial embarrassment apparently resulted from extensive engagements in Manhattan Electrical Supply stock which had declined fifty or more points in a day.

On August eleventh, after Fuller signed the " comparison ticket," the defendants sent out to the plaintiff the customary notice of sale, to the effect that these 100 shares of stock had been sold to A. L. Fuller & Co. on account of the " put " at ninety-two dollars per share. The notice of sale states that the defendants had sold for the " account and risk " of the plaintiff. After Fuller had refused to take in and pay for the stock, a notice was sent to the plaintiff stating that the first notice was voided because of Fuller's financial difficulties. Plaintiff refused to acquiesce in the cancellation of the transaction by the defendants and claimed the price at which it was consummated between A. L. Fuller & Co. and the defendants, to wit, ninety-two dollars per share. His contention is that the defendants upon sending him a confirmation slip on August 11, 1927, fixed their liability to him according to the rules of the relationship of vendor and vendee, and not of principal and agent; and he relies upon certain rules of the constitution of the New York Stock Exchange, which provide:

" When written contracts shall have been exchanged, the signers thereof are only liable." (Page 77 of the Rules.)

" No party to a contract shall be compelled to accept a substituted principal unless the name proposed to be substituted shall be declared in making the bid or offer and as a part thereof." (See page 80 of the Rules.)

Do these rules constitute the two brokers principals in an absolute sense or do they merely introduce some modification in the doctrine of the rights and liabilities of undisclosed principals? And what is the effect of these rules upon the present transaction in supporting plaintiff's claim that his brokers, the defendants, became absolutely liable to him upon sending a confirmation of the notice of sale?

In *Leo* v. *McCormack* (186 N. Y. 330, 332) we find the following

language peculiarly applicable: " It has, * * * been strenuously urged and thus far found that there is something so peculiar about the relation between a broker and his customer that the same is not subject to the ordinary principles and rules of agency. It very likely may be conceded that, as the result of long usage and of various rules made by the Stock Exchange, some exceptions have been engrafted upon the general rules of principal and agent for the particular benefit and help of brokers. But we are aware of no reason and no adjudication which should or does exempt such relationship from the fundamental principles which are applicable. to other phases of the relation of agency. In this particular case, upon the order and request of Cosmides and Uhren, the plaintiffs had bought for them certain shares of stock which they then held and carried for their respective accounts. These parties ordered plaintiffs to sell said stock and they did so, delivering, as it appears, the identical certificates which had been taken and carried for their customers. Under such circumstances, it would require some justification with which we are unacquainted to lead us to say that the customers were not the principals and that the plaintiffs were not their agents in the transaction and governed as such by the general rules of law upon that subject. Reaching this conclusion, it is, as we have said, substantially conceded that the fraud of the customers is to be imputed to the plaintiffs as their representatives."

In *Peckham* v. *Ketchum* (5 Bosw. 506) a broker was instructed to purchase for the plaintiff a specified number of shares of stock of the corporation named and he accordingly contracted to buy the specified number and received a certificate of stock, regular in form and issued by the proper officer of the corporation for the specified number of shares, and obtained payment therefor from his principal, which he remitted to the vendor. The certificate proved to be worthless, not representing any actual stock. An action was commenced against the broker. The court held for the defendant, saying that where the broker acted in good faith and according to the customary course of business among brokers in such cases he is not liable to his employer for any damage resulting to the latter from such transaction and purchase.

The rules of the Exchange so strongly relied upon by the plaintiff while they fix the relationship of principal between the broker members, can have no effect upon the rule of law relating to the mutual rights and liabilities of their clients, except to the extent to which these rights are subordinate to the equities between the brokers arising in consequence of the application of these rules. They do not, therefore, divest or detract from the character of the

relationship of principal and agent. Thus the principal is bound to indemnify the stockbroker for any loss sustained by the latter on account of this default. And if, pursuant to the rule of the Exchange imposing the liability upon him as principal in relation to his immediate cobroker, he should sustain any damage by reason of having made good for account of his client, the latter must indemnify his broker. The rules of the Exchange mentioned were intended to create a relationship of undisclosed principal. The intent of the provisions of the Exchange was to protect the brokers in dealings between themselves and not to jeopardize the ordinary transactions between them by a resort for relief to undisclosed principals whose financial ability, means or character were not known to the other trading party. It is subject to this custom that clients deal with their brokers who are members of the Exchange.

In *Smith* v. *Reynolds* (66 L. T. 808) the Court of Appeal held that a person who employs a broker to sell shares on the Stock Exchange is bound to indemnify the broker for any liability he may incur in consequence of carrying out his principal's instructions under any rules of the Stock Exchange, provided that such rules are reasonable. In *Mocatta* v. *Bell* (53 Eng. Rep. R. 483) the defendant employed a stockbroker to obtain a loan on the security of bonds which were transferable by delivery. The broker accordingly borrowed a sum from the plaintiff but he wrongfully applied a part to his own use, and was unable to redeem the bonds. The defendant with knowledge of the circumstances agreed to give his check for the deficiency on receiving back the bonds, and the broker acting on the faith of this promise gave a cross-check to the plaintiff and redeemed the bonds. On the same day the defendant by trick obtained possession of the bonds without giving his check and the broker's cross-check was consequently returned and he became a defaulter. It was held that the defendant was responsible to the plaintiff for the fraud, and that the bonds in his hands were still liable to repay the plaintiff for his debt. (See, also, *Harker* v. *Edwards*, 57 L. J. Q. B. 147.) In *Armstrong* v. *Jackson* (L. R. [1917] 2 K. B. 822) it was held that where a broker pretending to execute a mandate of his customer to buy, sells his own stock, the sale may be rescinded notwithstanding that the value of the things sold has decreased between the date of the sale and date of action for rescission. To similar effect see *Oelkers* v. *Ellis* (L. R. [1914] 2 K. B. 139).

In *Humphrey* v. *Lucas* (2 Car. & K. 152) it was held that if a broker entered into a contract for an undisclosed principal the latter may sue on such contract in his own name, and a rule of the Exchange

on which the contract was made, which declares that a contract made by a broker for an undisclosed principal shall be regarded as the contract of the broker only, does not control this right, even though the principal was cognizant of such rule. (See, also, *Nickalls* v. *Merry*, L. R. 7 H. L. 530.) And in *Mortimer* v. *McCallan* (151 Eng. Rep. R. 320) the court said (at p. 322) by ALDER-SON, B.: " The rule as to credit being given to the broker, is a mere honorary regulation among the members of the stock exchange. No one can doubt but that the plaintiff took the responsibility of the principal."

It thus appears that the rules of the Exchange referred to above do not usually preclude the client or customer from maintaining an action directly against the other undisclosed principal, or his broker, except where certain equities have intervened. An illustration of the exception is found in *Kent* v. *DeCoppet* (149 App. Div. 589). In that case the assignor of plaintiff — Escher — being owner of some shares of stock in a coal company, telephoned his brokers, Lathrop, Haskins & Co., dealing upon the Exchange, to sell the same. They executed the mandate by selling upon the Exchange these certificates at eighty-three and five-eighths. The offer to sell and the acceptance to purchase were signed by the respective brokers in their own names, and the defendants had no knowledge that plaintiff's brokers were not making the sale on their own account. After the sale the plaintiff's brokers sent him a notice that the stock had been sold and named the defendants as the brokers to whom the sale had been made. However, shortly thereafter, plaintiff's brokers notified the Exchange that they were insolvent and unable to meet their obligations, and upon announcement of this fact and in accordance with the rules of the Exchange applicable to the situation, all other members of the Exchange proceeded to close their contracts with the plaintiff's insolvent brokers. After the closing of the transaction by the defendants' brokers under the rules, the plaintiff's assignor instituted this suit to recover the purchase price on the theory of an executed sale. The court held in favor of the defendants. The soundness of that decision is not at all questioned; on its facts, it is correct. Plaintiff contends that the basis of the decision is that brokers *inter se* are principals and that when written contracts have been exchanged between them the signers thereof only are liable. But there was an additional rule involved, according to which, upon the insolvency of a member being announced to the Exchange, members having contracts subject to the rules of the Exchange with such member were to proceed to close the same. As will appear from the following quotation from that case, plaintiff's claim was disallowed, not

on the theory that the transaction concerned solely the two brokers as principals, but on the ground that defendants had closed out the transaction at the request, express or implied, of the insolvent brokers who represented plaintiff's assignor, and their equities resulting therefrom in favor of the broker on the other side bound the insolvent broker's principal. As was said by the court (at p. 596): "At the time the defendants were notified of Escher's claim, their contract with Lathrop, Haskins & Co. had been terminated. What rights Escher may then have had, if he had any rights against the defendants at all, it is unnecessary, for the reason heretofore given, to determine. He certainly did not have the right to enforce a contract which they, in perfect good faith, and without any knowledge whatever of his interest, had closed at the request of his brokers."

The true nature of the contracts between brokers on the Exchange dealing for their respective principals is well summed up in *Orvis* v. *Wells, Fargo & Co.* (73 Fed. 110) where it was held that an agreement between two brokers each acting for an undisclosed principal does not give rise to two distinct contracts, one between the brokers and the other between the principals, but to one contract only, and separate satisfactions cannot be obtained from both broker and principal for a cause of action arising out of said contract.

Finally, in Halsbury's Laws of England (Vol. 27, p. 219), the author distinctly states a rule which is contrary to the contention of the plaintiff, that the defendant's sales notice was an absolute guaranty of the payment of the proceeds of sale, whether these were received or not. He says: "A broker accepting an order does not warrant that he will execute it at all events, but only that he will use reasonable diligence in the endeavor to do so; nor, if he executes the order, does he become a *del credere* agent."

It is unnecessary to give any additional citations to show that plaintiff's motion for summary judgment is not well founded. Whether defendants' cross-motion for dismissal of the complaint is well founded, I do not choose to pass upon now, by reason of the fact that the parties to the litigation are in process of adjusting their differences.

If they should fail in their negotiations the motion to dismiss may be renewed. At this time it is denied without prejudice and the motion of the plaintiff for summary judgment is likewise denied.