Martin B. Stecher, J.
The plaintiff, an investor, sues the defendant, his former stockbroker for conversion of the plaintiff’s securities held in a margin account. Most of the facts were stipulated and testimony was taken on a limited number of issues.
After trial, I find that prior to April of 1970 and at all material times, the plaintiff maintained a margin account with the defendant. On or about April 26, 1970 the plaintiff instructed the defendant broker to purchase for his account, for cash, 500 shares of Belmont Franchising Oorp. common stock, an over the counter security, at $31 a share for a total price including taxes and commissions of $15,687.50. The plaintiff never paid for the stock and prior to the expiration of seven business days from the time of purchase (cf. Reg. T, Code of Fed. Reg., tit. 12, § 220.4), that is on May 5, 1970, ordered the defendant to sell the stock. The defendant sent the plaintiff a confirmation for the sale of 500 shares of Belmont at $37 a share with a net sales price after tax and commission of $18,272.50. The confirmation set forth that the defendant acted as agent for the plaintiff. The settlement date was May 12, 1970 and the stock was sold to a Hempstead, Hew York brokerage house, Lincoln Securities Company, for the latter’s own account. On the settlement date the defendant, in accordance with the custom of the securities industry, delivered the securities to Manufacturers Hanover Trust Company for delivery to Lincoln’s bank in Hempstead against collection of the price, $18,500. Simultaneously, the defendant procured a broker’s loan from Manufacturers in the sum of $18,500, the entire sales price, secured by the receivable, or the securities and remitted to the plaintiff the net profit of $2,585. (As of May 5 the defendant had suspended the plain *433 tiff’s trading rights for a period of 90 days by virtue of the plaintiff’s failure to pay for the securities before he sold them.)
The securities were tendered to Lincoln in Hempstead on Friday, May 15, 1970. On Monday, May 18, 1970 the market for Belmont collapsed, knowledge having been obtained that the price of Belmont had been illegally manipulated.
Lincoln refused to accept the securities from the defendant and on May 19 returned them to the defendant via the banks through which tender had been made with a memorandum, “Return Unpaid, Attorneys Advise.” The defendant thereupon had the securities reregistered m its own name and tendered them again to Lincoln. Again Lincoln refused to accept-' delivery.
On June 12, 1970 one day after the defendant’s third unsuccessful effort to deliver the securities to Lincoln, it notified the plaintiff for the first time, of Lincoln’s refusal to consummate the transaction and of its opinion that the Belmont stock could not be sold elsewhere. The defendant demanded that the plaintiff pay to it the sum of $18,272.50 consisting of the purchase price to the plaintiff together with the “profit” paid by the defendant on the sale. Following the plaintiff’s refusal to make such payment, the defendant, on April 5, 1971, liquidated the plaintiff’s securities held in his margin account. Oliphant compensated itself for sales commissions on the liquidation of the securities and charged the proceeds with the Belmont loss and the balance of the margin account; counterclaiming for the sum of $1,942.17, the deficiency resulting on the liquidation.
The defendant was guilty of neither fraud nor negligence proximately causing the loss and the loss was incurred solely by reason of the purchaser’s failure to accept and pay for the securities.
The broker argues that it acted solely as an agent for the plaintiff, its principal, and under the circumstances of this case, the loss should be the principal’s not the agent’s. The plaintiff’s expert witnesses testified that it is unheard of for a securities broker-dealer to charge a customer with the failure of a purchaser to pay for securities and that the custom of the industry is to invariably place the risk on the broker. No contrary evidence was offered. The plaintiff also offered in evidence, without objection, a portion of the “Rules of Fair Practice ” of the National Association of Securities Dealers (NASD) (art. II, § 1, [j]) which provides in pertinent part, “ The term‘ the completion of the transaction ’ means: * * * (4) In the case of a customer who sells a security * * * *434 through a member and who delivers such security to such member prior to the time when delivery * * * is due, the time when such member makes payment to or into the account of such customer.” It is conceded that the defendant was a member of the NASD. (It is regretted that the balance of the NASD rules was not offered in evidence by either side.) The rule presumably was designed, at least in part, ‘ ‘ to protect invests ors ” (cf. Securities Exchange Act of 1934, IT. S. Code, tit. 15, § 780-3, subd. [b], par. [8]).
The fact that brokers often or even always voluntarily assume the risk of loss upon the failure of the purchaser to make payment is not alone sufficient to require this broker to bear this loss. Clearly, at the time the purchase was made and at the time the sale was executed, the broker was the agent and the customer the principal, and the usual consequences of the principal-agent relationship obtained (Leo v. McCormack, 186 N. Y. 330; Crusius v. Louchheim, 132 Misc. 520). Here, however, we have a number of factors occurring subsequent to the creation of the principal-agent relationship which must be considered in conjunction with the NASD rule and the testimony of the expert witnesses.
The defendant, on May 12,1970 upon delivering the securities to Manufacturers Hanover Trust Company for delivery, borrowed the full sales price against the receivable or the securities, a sum exceeding any lien the broker had on the items (Kittredge v. Grannis, 244 N. Y. 168; General Business Law, § 339-e). If at that time the property was still that of the customer, the defendant was guilty of a misdemeanor (General Business Law, § 339-e, subd. 2). The defendant was privileged, of course, to borrow in full against its own property, or in part against liened property to the extent of the lien. When faced with a choice between interpreting the defendant’s act as within or without the law, the court will presume legality.
When Lincoln, the abortive purchaser, returned the securities to the defendant under circumstances which were, to say the least, dubious, the defendant promptly caused the certificates to be reissued naming itself as owner. A more unequivocal act of ownership is difficult to imagine. Too, the defendant, on the settlement date, paid to the plaintiff his profit on the transaction. While alone, this might be considered an act of generosity, in the context of this case it appears to have been the termination by the defendant of the plaintiff’s interest in the transaction.
*435 It would thus appear that the defendant’s own acts were an acknowledgement that when the quoted provision of the NASD rules had been complied with, the broker succeeded to the customer’s position in the transaction and itself became the customer’s debtor. The customer being guilty of no fraud, deception or other wrong contributing to the loss, it must be borne by the defendant.
Judgment may be entered dismissing the counterclaim and in favor of the plaintiff against the defendant for the sum of $19,221.92, with interest from April 5, 1971, that sum being computed as the highest value of the four securities during the month of April, 1971 (Hartford Acc. & Ind. Co. v. Walston & Co., 22 N Y 2d 672) plus the dividend declared on those securities to the time of sale less the margin indebtedness which was owed by the plaintiff to the defendant at the time of sale.