■ MURRAY PASSMAN, Respondent, v. JAS. H. OLIPHANT & Co., Appellant.— Judgment entered March 5, 1974 in the Supreme Court, New York

County, in plaintiff's favor and dismissing defendant's counterclaim after a nonjury trial, reversed, on the law, and vacated, the complaint is dismissed and judgment granted to defendant on its counterclaim in the sum of $1,942.17, with $60 costs and disbursements to appellant. The facts, recited in the dissent, are undisputed. The trial court properly concluded that the defendant was not guilty of any fraud or negligence proximately causing the loss which was due solely to Lincoln's wrongful refusal to accept the proper tender of the stock. We also agree with the trial court's finding that " Clearly, at the time the purchase was made and at the time the sale was executed, the broker was the agent and the customer the principal, and the usual consequences of the principal-agent relationship obtained (*Leo* v. *McCormack,* 186, N. Y. 330; *Crusius* v. *Louchheim,* 132 Misc. 520) ". (*Passman* v. *Oliphont & Co.,* 77 Misc 2d 431, 434.) Nothing in this record supports the lower court's ultimate conclusion that by virtue of its conduct the defendant broker-agent succeeded to its customer's position as principal. On the contrary, it clearly appears that the relationship of principal and agent endured without change. The dissenter agrees with us that the acts of the defendant broker did not change the status of the parties. He would reverse and order a new trial on what he terms was the second ground upon which the court found in plaintiff's favor, i.e., that it is a custom in the business of trading securities for the broker to assume the risk of the buyer failing to complete the transaction. Our distinguished and highly respected colleague is in error. The trial court expressly disavowed liability on that ground (p. 434): " The fact that brokers often or even always voluntarily assume the risk of loss upon the failure of the purchaser to make payment is not alone sufficient to require this broker to bear this loss." Under the provisions of CPLR 5522, we should, on an appeal from a judgment rendered by the court without a jury, unless we affirm, grant the judgment which the court ought to have granted. (See *Society of N. Y. Hosp.* v. *Burstein,* 22 A D 768 and cases therein cited.) Concur — Nunez, J. P., Kupferman and Murphy, JJ.; Lupiano and Steuer, JJ., dissent in the following memorandum by Steuer, J.: I am in accord with my colleagues that the judgment should be reversed but, instead of granting judgment to defendant on its counterclaim, an issue which was decided on an inadvertent view of the evidence should be resolved. The events underlying this controversy are undisputed. Defendants are stockbrokers. Plaintiff is a customer, having a margin account. On April 26, 1970, he ordered defendant to purchase 500 shares of Belmont Franchising Corp., an unlisted security. Defendant did so at a cost of $15,687.50. It advised plaintiff that, as this was an unlisted security, the transaction would be for cash, and asked for a remittance in the sum mentioned. The stock had increased in price, and plaintiff asked that it be sold. Defendant did effect a sale, for a total price of $18,500. The purchasing broker was Lincoln Securities Company in Hempstead, Long Island, and the settlement date was May 12, 1970. Defendant delivered the certificates to Manufacturers Hanover Trust Company for delivery to Lincoln's bank in Hempstead against a payment of $18,500. At the same time defendant borrowed $18,500 from Manufacturers on defendant's note. On the same day, May 12, 1970, defendant sent plaintiff a check for $2,585, which represented the full sales price of $18,500 less the cost price and commissions and taxes. On May 15, 1970, the Belmont stock was delivered to Lincoln, which refused the delivery on the ground that "Attorneys Advise". The certificates were returned to defendant on May 25, with the stated reason for refusal of delivery. Defendant then had the certificates transferred to its own name and tendered them

again to Lincoln, which once more refused delivery on the same professed ground. A third unsuccessful attempt at delivery was made on June 11, 1970. It further appears that the market in Belmont stock had collapsed on May 18, and the stock was unsalable. Defendant then demanded payment of $18,500 from plaintiff. Upon plaintiff's refusal and due notice, defendant sold out the stocks in plaintiff's account. The amount realized left a debit of $1,942.17. Plaintiff then brought this action for conversion of his equity in the account. No claim of impropriety in the sale was made, and the sole question presented was whether plaintiff, the customer, or defendant, the broker, was to bear the loss resulting from Lincoln's improper refusal to accept and pay for the stock. Trial Term decided in favor of the customer on two grounds: first, that the acts of the broker in borrowing the full amount of the sales price against the stock and having the certificates transferred to its name made the broker the principal in the transaction, and, second, that it is a custom in the business of trading securities for the broker to assume the risk of the buyer failing to complete the transaction. As to the first ground, we are all in accord that the acts of the defendant broker did not change the status of the parties. The broker did not borrow on the security of the stock. The certificates were not intended to remain with the lender as a pledge and, conversely, were directed to be delivered to a third party. For all that appears, this was an unsecured loan and no assumption of ownership could be imputed from it. The transfer of registration was clearly for the purpose of obviating any objection to the delivery. Likewise, no assumption that defendant dealt with the stock as its own property can be drawn from this fact. The second ground advanced by the court has, in my opinion, merit. It is claimed that there is a custom among those trading in securities, including brokers, that the broker for the seller assumes the risk that the other or the other's principal will perform — that is, pay the agreed price. The majority of this court appear to be of the opinion that such a custom, even assuming it exists, would rest on an impermissible or unenforceable change in the relationship of principal and agent and, hence, cannot be recognized by the court. I differ. It is indisputable that a principal and his agent may agree between themselves that the agent should guarantee the performance of any third person with whom he contracts for the benefit of the principal. A custom of the trade would have the same effect, subject, of course, to its being established that the alleged custom meets the requirements of being so regarded. It is in this last respect that Trial Term erred. The court stated that the evidence of custom was uncontroverted. Defendant vigorously denied the existence of any such trade practice and offered evidence to support its denial. Either the court overlooked this evidence or did not deem it sufficient to raise an issue, which it was. This, in my opinion, is not only the nub of the case but what would give it significance as a precedent and guide to the stockbrokerage industry. Consequently, the issue should be thoroughly explored. Lupiano, J., concurs. Settle order on notice. [77 Misc 2d 431.]